**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JEROME JUNIOR WASHINGTON, | ) | |
| | ) | Civil Action No. 18 – 339 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| SUPERINTENDENT MR. GILMORE | ) | ECF No. 90 |
| and MEDICAL CHCA-MR. GUTH, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

Pending before the Court is a Motion for Summary Judgment filed by Defendants Superintendent Mr. Gilmore and Medical CHCA-Mr. Guth, collectively referred to herein as "Defendants" or "the moving Defendants." (ECF No. 90.) For the following reasons, the Motion for Summary Judgment will be granted.

**A. Procedural History**

Jerome Junior Washington ("Plaintiff") is an inmate currently in the custody of the Pennsylvania Department of Correction ("DOC") who was incarcerated at the State Correctional Institution at Greene (SCI-Greene) when he initiated this action on or about March 15, 2018. (ECF No. 1.) His Complaint was docketed on April 12, 2018, after he was granted leave to proceed *in forma pauperis*. (ECF Nos. 2-5.) In his Complaint, Plaintiff brings claims against

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. (ECF Nos. 23, 30 & 107.)

three Defendants:  Robert Gilmore, the former Superintendent of SCI-Greene ("Gilmore"); Kyle

Guth, the former acting Corrections Health Care Administrator ("CHCA") at SCI-Greene

("Guth"); and the City of Pittsburgh.  In general, Plaintiff alleges that these Defendants violated

his rights under the Eighth and Fourteenth Amendments to the United States Constitution in

relation to medical care and treatment for his chronic injuries and conditions during the early part

of 2017.  (ECF No. 5, p.1.)  Defendant City of Pittsburgh filed a Motion to Dismiss for Failure to

State a Claim, which was granted on September 4, 2019.  (ECF Nos. 32, 54 & 55.)  As a result,

the City of Pittsburgh was dismissed from this action with prejudice.  Defendants Gilmore and

Guth filed a Motion for Summary Judgment on June 1, 2020.  (ECF No. 90.)  Plaintiff filed a

Response in Opposition to their Motion on June 22, 2020.  (ECF No. 96.)  The Motion is now

ripe for review.

**B.  Relevant Factual Background**

Relevant to this action, Plaintiff was transferred to SCI-Greene on or about July 13, 2016.

(ECF No. 93-1, p.3.)  For most of his time at SCI-Greene, Plaintiff was confined in the Secure

Residential Treatment Unit.  Id., pp.3-5; see also (ECF No. 5, ¶¶ 1-2, 4.)

In his Complaint, Plaintiff alleges that he suffers from numerous chronic injuries and

medical conditions for which he was denied and/or not provided proper treatment while he was

housed at SCI-Greene beginning in January of 2017, through at least May of 2017.  (ECF No. 5,

¶¶ 15-19.)  These conditions allegedly ranged from anal bleeding; a curved spinal cord; arthritis;

glaucoma; cataracts; elbow, wrist and knee displacement; and a MRSA infection.  Id., ¶¶ 22-27.

He alleges that as the CHCA, Defendant Guth ignored all of his requests for medical care and

treatment for these conditions and turned a blind eye to the poor medical care that was provided

to inmates at SCI-Greene.  Id., ¶¶ 15-21, 28.  He also alleges that as the Superintendent,

Defendant Gilmore was responsible for supervising all of the medical vendors at SCI-Greene and overseeing the medical care that is provided to the prisoners in his custody.  Id., ¶ 4.  However, he claims that Defendant Gilmore also turned a blind eye to the lack of appropriate medical care and treatment provided to prisoners like himself at SCI-Greene.  Id., ¶ 29.

In support of summary judgment, the moving Defendants have provided the affidavit of Defendant Gilmore.  (ECF No. 93-2.)  Defendant Gilmore states that as of March 20, 2020, he is retired from the Pennsylvania DOC but he was last employed as the Superintendent at SCI-Greene.  Id., ¶ 1.  As Superintendent he was responsible for directing, through subordinate professional staff, the implementation of the comprehensive correctional program at SCI-Greene. Id., ¶ 3.  His duties included the responsibility for the overall care, custody, and control of the facility's inmate population.  Id.  More specifically, he would oversee facility staff responsible for the administration of a wide range of correctional programs and services, and review, and implement DOC and facility policies and procedures promoting a diversified correctional program.  Id.  He did not have any formal medical education, training or certification beyond rudimentary first aid.  Id., ¶ 7.  As such, he did not provide – nor was he involved with the provision of – medical care and treatment to inmates confined within the DOC or at SCI-Greene specifically.  Id.

Defendant Gilmore also states that SCI-Greene has a Medical Department that provides medical care and treatment to inmates confined there.  Id., ¶¶ 4, 14.  The Medical Department falls within the responsibilities of the Deputy Superintendent for Centralized Services ("DSCS"), who is a direct report to the Superintendent.  Id., ¶ 4.  The Medical Department is staffed with clinicians and nurses who provide medical care and treatment to inmates, and inmates can also be sent out for medical services for treatment in the community.  Id., ¶ 14.  The DOC also

3

contracts out certain aspects of the medical care provided to inmates through a third-party vendor. Id., ¶ 5. The vendor provides a Medical Director and other clinicians and support staff for SCI-Greene. Id. The Medical Director is responsible for managing the clinicians and overseeing treatment and care decisions. Id. The DOC employs a Corrections Health Care Administrator ("CHCA") who acts as a liaison between the DOC staff and the third-party vendor. Id., ¶ 6. The CHCA is a direct report to the DSCS. Id. Defendant Gilmore states that he does not have any formal medical education, training or certification beyond rudimentary first aid. Id., ¶ 7. As such, he does not provide, nor is he involved, with the provision of medical care and treatment to inmates. Id. He states that during his time as Superintendent he had no regular day-to-day contact with inmates and no role in any aspect of the medical care and treatment provided to inmates. Id., ¶ 11. As such, he was never involved in any medical care and treatment provided to Plaintiff, and he would not have been actively aware of any aspect of his medical care and treatment unless such issues would be brought to his attention through the inmate grievance process. Id., ¶ 12. Nevertheless, he avers that at no time during his tenure as Superintendent did he believe that any inmate, including Plaintiff, was being denied any necessary or required medical care and treatment. Id., ¶¶ 15-16.

The moving Defendants have also provided the affidavit of Defendant Guth. (ECF No. 93-3.) Defendant Guth states that he has been employed with the Pennsylvania DOC since May of 2010. Id., ¶¶ 1-2. He has been primarily employed as a Medical Records Supervisor, initially at SCI-Greene and, since January of 2018, at the State Correctional Institution at Somerset. Id., ¶¶ 2, 6. From June of 2016 until December of 2016, Defendant Guth served as the CHCA at SCI-Greene in an acting capacity. Id., ¶ 7. Defendant Guth's tenure as acting CHCA at SCI-Greene ended in December of 2016 when SCI-Greene hired a full-time CHCA. Id., ¶ 9.

4

Defendant Guth then returned to his former position as Medical Records Supervisor at SCI-Greene.  Id.  According to Defendant Guth, both the Medical Records Supervisor and CHCA positions are administrative positions that do not require any formal medical education, training or certification.  Id., ¶¶ 4, 8.  As such, Defendant Guth does not have any formal medical education, training or certification, and he does not and did not provide, nor was he involved with the provision of, medical care and treatment to inmates.  Id., ¶ 5.  Defendant Guth states that during the time period Plaintiff appears to be complaining about his medical care at SCI-Greene, he was no longer acting CHCA and had already returned to his position as Medical Records Supervisor.  Id., ¶¶ 12-13.  Beginning in January of 2017, he had no day-to-day contact with inmates, including Plaintiff, and no role in any aspect of the medical care and treatment provided to inmates.  Id., ¶¶ 13-14.  However, he states that at no time during his tenure as acting CHCA or as Medical Records Supervisor at SCI-Greene did he ever come to believe that any inmate, including Plaintiff, was being denied any necessary or required medical care and treatment.  Id., ¶¶ 17-18.

The moving Defendants have also submitted for consideration Plaintiff's medical records from January 2017 through January 2019.[2]  (ECF Nos. 93-4 through 93-8.)  These records reflect that from January 1, 2017, through January 29, 2019, Plaintiff had over 60 contacts with the medical staff at SCI-Greene, including Registered Nurses, Certified Registered Nurse Practitioners, Physician's Assistants and Medical Doctors.[3]  (ECF Nos. 93-4, 93-5, 93-6, 93-7,

---

[2] The Court notes that while Defendants have submitted Plaintiff's medical records for the time period covering January 2017 through January 2019, Plaintiff's Complaint appears to only concern issues with his medical care and treatment at SCI-Greene in the first several months of 2017.  Indeed, the last identified date in Plaintiff's Complaint, which is dated March 8, 2018, appears to be May 25, 2017.

[3] This number does not include the numerous contacts sometimes made on the same day when Plaintiff was being monitored by medical staff while in psychiatric observation cells.

93-8.)  He was also sent to an outside hospital on at least four occasions during this time period
and received numerous different medications for his medical issues.  (ECF Nos. 93-4, 93-7.)
Specifically, his records reveal the following:

Plaintiff was seen by various medical providers for self-inflicted injuries at least 16 times
in 2017[4] and at least 3 times in 2018[5].  Such injuries included swallowing foreign objects
(batteries and flex pens) and lacerations to both of his forearms.  His reasons for the self-
injurious behavior varied.  For instance, once he stated that it was just "a game" to him, once he
stated that he just wanted to see the females in medical, once he stated it was because a lady hurt
his heart, but many times he admitted it was because the correctional officers or medical
providers would not give him what he wanted.  X-rays were taken when he swallowed foreign
objects after which he was transferred to Washington Hospital for further treatment on at least
four occasions.[6]  During the times he cut himself, Plaintiff's wounds were always cleaned and
sutured, and the dressings were routinely changed.

Also in 2017, Plaintiff was seen by various medical providers for medical complaints
unrelated to self-harm.  Specifically, as they are relevant to his complaints in this case, his
records reveal the following.  On January 11, 2017, he was seen and requested Neurontin and
Tramadol, but he was told there was no clinical indication of chronic pain for which the
medication was necessary.  On January 25, 2017, he was seen and requested Neurontin and
Ultram, but he was again told there was no indication for pain management.  On March 2, 2017,
he was seen for complaints of knee pain and was instructed on exercises that could help.  On

---

[4] January 1, January 6, January 31, February 7, March 20, March 29, April 4, June 5, July 27, August 28, October 4, October 12, October 20, November 2, November 13, and December 30 of 2017
[5] February 8, February 9, August 27 of 2018
[6] January 6, 2017; February 7, 2017; March 31, 2017; and August 27, 2018

March 10, 2017, he was seen and requested Ultram and Neurontin, but again he was told that there was no indication for pain management. On May 4, 2017, he was seen for complaints of knee and joint pain. He requested a full-body MRI, but he was instructed to continue his exercises. On May 26, 2017, Plaintiff requested a hormone shot to make his "breast implants go away," but was told that he had gynecomastia that was likely permanent as a result of taking Risperdal. On August 23, 2017, he was seen and requested Ultram and Neurontin for "spinal cord problems, knee problems, [and] arthritis," but he was told that neither medication was medically indicated. On October 31, 2017, he was seen and requested Ultram for his back pain, but he was again told that no medical treatment was warranted per current treatment guidelines for chronic back pain.

In 2018, Plaintiff was seen by various medical providers for medical complaints unrelated to self-harm on at least 35 occasions. Specifically, as they are relevant to his complaints in this case, his records reveal the following. On January 2, 2018, he was seen for complaints about hemorrhoids and rectal bleeding with bowel movements. He also complained of knee pain and requested renewal of his eye drops. He was given suppositories for his hemorrhoids and his eye drop prescription was renewed. On January 3, 2018, he was seen for complaints of back pain, anemia, bloating, and problems with his thyroid. Blood labs were ordered and the doctor informed him that she would review prior medications that he had been on for his back pain. Later that same day he was offered but refused suppositories and eye drops. On January 4, 2018, he was seen again for complaints of back pain and knee pain, as well as continued complaints of hemorrhoids. The doctor ordered x-rays and prescribed Plaintiff 375mg Naproxen, which Plaintiff later refused because he wanted Tramadol instead. Plaintiff's x-ray of his right knee from that day showed mild degenerative changes with soft tissue swelling and a

joint effusion.  His x-ray of his lumbar spine showed mild scoliosis.  On January 31, 2018, Plaintiff was seen for complaints of "weak bones" and joint pain.  The doctor noted Plaintiff's recent x-rays which confirmed arthritic changes.  Plaintiff requested additional x-rays of his elbows, arms, wrists and hands, but he was told that it was not medically necessary because he had no injuries and his joint paint was related to arthritis.  The doctor noted that he was on Naproxen, but Plaintiff insisted that he needed Tramadol.  It was noted that no other medication for his joint pain was medically indicated at that time, including Tramadol.  Plaintiff also complained that he needed more Vitamin D but was told that his current dose was appropriate and was advised to purchase additional vitamins from the commissary if he thought he needed more.  Plaintiff was also referred to an optometrist for an evaluation.  Plaintiff continued to request additional x-rays of his joints in follow-up sick call slips he submitted a few days later.  He also requested additional vitamins, Tramadol and steroid injections for his knees.  The doctor noted that all of Plaintiff's labs were normal except for Vitamin D and that Plaintiff was on Naproxen which was indicated for his joint pain.  She noted that there was no medical need for Tramadol or additional vitamins and that she had previously discussed with Plaintiff the risk of infection with injections in knees.

On February 6, 2018, Plaintiff was seen for complaints of joint pain and requested x-rays of all his joints.  He was informed that x-rays were not indicated without an acute injury and that his joint pain was from arthritis.  He insisted on Ultram and steroids, but the doctor informed him that NSAIDs were indicated for arthritis.  She noted that there was no medical necessity for Ultram and ordered him Diclofenac.  Plaintiff also complained of hemorrhoids and stated that he was having some bleeding with bowel movements.  The doctor ordered cream and Preparation H for his hemorrhoids.  On February 8, 2018, Plaintiff was seen after he swallowed a pen in

response to not getting the medication that he wanted.  He again demanded Ultram and Neurontin, but the doctor informed him that NSAIDs were medically indicated for his arthritis. She also noted that Plaintiff was refusing to take NSAIDs because it was not the medication that he wanted.  Plaintiff had x-rays of his abdomen and of both his left and right wrists and elbows performed on February 9, 2018.  The x-rays of his abdomen showed three foreign bodies consistent with pens, and the x-rays to his wrists showed soft tissue swelling.

On March 6, 2018, Plaintiff was seen and again requested Ultram and Neurontin for what he described as his curved spine and torn tissue in his knees.  No overt pain was noted so his current treatment plan was continued.  On April 2, 2018, Plaintiff demanded a full-body MRI, as well as Ultram and Neurontin.  His prescription for Diclofenac was renewed for his joint pain. On May 1, 2018, Plaintiff was seen and complained that his arthritis was not being medically treated.  He insisted that he be prescribed Ultram, Neurontin and Flexeril.  It was noted that Plaintiff was receiving NSAIDs.  Plaintiff also complained of glaucoma, but it was noted that he had previously refused his ophthalmology appointment.  His current treatment plan was continued, and another ophthalmology appointment was scheduled.

On May 29, 2018, Plaintiff reported experiencing rectal bleeding.  He was provided three hemoccult cards to detect the presence of occult blood in his stool.  On August 17, 2018, he reported vomiting after meals for the prior ten days and experiencing stomach cramps.  He was provided with Zofran for nausea and Miconazole for a rash on his feet.

On September 10, 2018, Plaintiff was seen for complaints of hemorrhoids and knee pain. He requested an MRI.  It was noted that his x-rays of his wrists and elbows in February 2018 showed only soft tissue swelling, but x-rays were ordered of his right knee.  A rectal exam was

performed that revealed an external fleshy lesion but no rectal masses or prostate nodules.  The x-ray of his right knee performed on September 12, 2018 showed a normal knee.

Plaintiff was again seen for complaints of rectal bleeding on September 27, 2018 and October 19, 2018.  Labs were ordered but it was noted that medical was waiting for his outside GI records.  He was seen again on November 6, 2018, at which time it was noted that his rectal bleeding was consistent with hemorrhoids and he was provided with additional ointment.  On November 27, 2018, he was again ordered ointment for hemorrhoids and was told that medical would follow-up when treatment was completed.  He also requested to see an eye doctor but it was noted that his last eye appointment was in August.  Plaintiff had another rectal exam performed on January 18, 2019.  A grape sized hemorrhoid with evidence of bleeding was noted and more hemorrhoid ointment was prescribed.  A follow-up exam was performed on January 29, 2019, at which time it was noted that the external hemorrhoid remained unchanged.  However, it was noted that Plaintiff's records revealed that he was only 55% compliant with his hemorrhoid ointment.  The treatment plan was for Plaintiff to try Tucks hemorrhoidal pads.

## C. **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis within).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joinders of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party.  Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupported by admissible evidence.  FED. R. CIV. P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323; see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).  Failure to properly support or contest an assertion of fact may result in the fact being

considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition.  FED. R. CIV. P. 56(e).

### D.  <u>Discussion</u>

#### 1.  <u>The Defendants are entitled to summary judgment on Plaintiff's claims for monetary relief asserted against them in their official capacities.</u>

Defendants move for summary judgment insofar as Plaintiff is suing them in their respective official capacities.  In this regard, it is well established that lawsuits seeking retrospective relief by private persons against a state, state officials, and state entities are generally barred by the Eleventh Amendment.  *See* <u>Regents of the Univ. of Cal. v. Doe</u>, 519 U.S. 425, 429 (1997) (stating that "[i]t has long been settled" that the Eleventh Amendment applies to "not only actions in which a State is actually named as the defendant, but also certain actions against state agents and instrumentalities").  Relevant here, Eleventh Amendment immunity bars actions for retroactive relief against state officials acting in their official capacity because "'a judgment against a public servant in his official capacity imposes liability on the entity that he represents . . . .'"  <u>Kentucky v. Graham</u>, 473 U.S. 159, 169 (1985) (quoting <u>Brandon v. Holt</u>, 469 U.S. 464, 471 (1985)); *see also* <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . .  As such, it is no different from a suit against the State itself.").  Thus, "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."  <u>Ford Motor Co. v. Department of Treasury of State of Indiana</u>, 323 U.S. 459, 464 (1945).  A state may waive the defense by consenting to be sued and Congress may abrogate state sovereign immunity pursuant

to its power to enforce the Fourteenth Amendment.  Koslow v. Pennsylvania, 302 F.3d 161, 168 (3d Cir. 2002).

In this case, Plaintiff seeks monetary damages against the moving Defendants, two DOC officials.  However, the Pennsylvania Department of Corrections is undoubtedly a state instrumentality and its officials are state agents.  *See* 71 Pa. C.S.A. § 61 ("executive and administrative work of [the Commonwealth of Pennsylvania] shall be performed by" various executives and administrative agencies, including the "Department of Corrections").  As such, they are protected from suit by Eleventh Amendment immunity unless either exception to state sovereign immunity applies, which does not.  Pennsylvania has not waived its sovereign immunity defense in federal court, *see* 42 Pa. C.S.A. § 8521(b), and Congress did not abrogate Eleventh Amendment immunity via § 1983.  *See* Quern v. Jordan, 440 U.S. 332, 345 (1979) (concluding that the history and language of § 1983 indicate that Congress did not intend to make states liable under the statute).  Thus, state sovereign immunity prohibits Plaintiff's claims against the moving Defendants insofar as they are sued in their official capacities.

**2.  Defendants are entitled to summary judgment on Plaintiff's claims for injunctive relief.**

In addition to monetary relief against the Defendants, Plaintiff appears to be seeking prospective injunctive relief.  This claim for relief could have relevance to Plaintiff's claims against the moving Defendants in their official capacities because the law recognizes an exception to the Eleventh Amendment for claims brought against state officials in their official capacities for prospective injunctive relief.  This exception to the Eleventh Amendment immunity provides federal courts with authority to issue injunctions against state officers where there is evidence of ongoing violations of federal law and the injunction will afford a plaintiff

13

prospective relief from the illegal state action.  Ex parte Young, 209 U.S. 123, 159-60 (1908).

Essentially, Ex parte Young provides a means for plaintiffs to seek prospective injunctive relief

for ongoing violations of federal law by bringing an official capacity action against state

officials, rather than against a state directly, without running afoul of the Eleventh Amendment.

See Graham, 473 U.S. at 167 n.14; see also Koslow, 302 F.3d at 177 n.20.

The Court finds that to the extent Plaintiff is seeking injunctive relief against the

Defendants, such claims are moot because Plaintiff is no longer incarcerated at SCI-Greene.  In

this regard, it is well established that the adjudicatory power of a federal court depends upon "the

continuing existence of a live and acute controversy."  Steffel v. Thompson, 415 U.S. 452, 459

(1974).  "The rule in federal cases is that an actual controversy must be extant at all stages of

review, not merely at the time the complaint is filed."  Id. at 459 n.10.  "Past exposure to illegal

conduct is insufficient to sustain a present case or controversy regarding injunctive relief if

unaccompanied by continuing, present adverse effects."  Rosenberg v. Meese, 622 F.Supp. 1451,

1462 (S.D.N.Y. 1985) (citing O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)).  Thus, a

prisoner's transfer or release from the facility complained of moots his claims for injunctive

relief because he is no longer subject to the conditions he alleges are unconstitutional.  Sutton v.

Rasheed, 323 F.3d 236, 248 (3d Cir. 2003); Abdul-Akbar v. Watson, 4 F.3d 195, 206-07 (3d Cir.

1993).  While there is an exception to this mootness doctrine when "(1) the challenged action

was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there

[is] a reasonable expectation that the same complaining party [will] be subjected to the same

action again[,]" Weinstein v. Bradford, 423 U.S. 147, 349 (1975), the Court cannot speculate that

Plaintiff will once again be incarcerated at SCI-Greene, see, e.g., Abdul-Akbar, 4 F.3d at 207,

and, even if he were to be confined there in the future, the Court notes that Plaintiff's claims

14

would nevertheless be moot because Defendant Gilmore is retired from the Department of

Corrections and Defendant Guth is no longer the CHCA at SCI-Greene, nor is he currently

employed at SCI-Greene, and therefore they are no longer in a position to engage in the

challenged conduct.  *See*, *e.g.*, Bey v. Pennsylvania Dept. of Corrections, 98 F.Supp.2d 650, 658

(E.D. Pa. May 31, 2000) (finding that plaintiff's claim for injunctive relief against former prison

Superintendent in his official capacity was moot where he had since resigned); *see also*

DeGrange v. West, 2005 WL 1279132, at *2-3 (E.D. Pa. May 26, 2005).  As such, the Court

does not find that Plaintiff can invoke this exception to the mootness doctrine and that

Defendants are entitled to summary judgment insofar as Plaintiff brings claims against them in

their official capacity for injunctive relief.

### 3. <u>Defendant Gilmore is entitled to summary judgment because Plaintiff has failed to adequately allege his personal involvement in the asserted violations of his rights.</u>

Defendants move for summary judgment on the ground that Plaintiff has failed to

adequately allege Defendant Gilmore's personal involvement in the asserted violations of his

rights.  In this regard it is well settled that a "defendant in a civil rights action must have personal

involvement in the alleged wrongs; liability cannot be predicated solely on the operation of

*respondeat superior*."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing Parratt

v. Taylor, 451 U.S. 527, 537 n.3 (1981) (other citation omitted)); *see also* C.N. Ridgewood Bd.

of Educ., 430 F.3d 159, 173 (3d Cir. 2005) ("To impose liability on the individual defendants,

Plaintiffs must show that each one individually participated in the alleged constitutional violation

or approved of it.") (citing C.H. v. Oliva, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).  A

plaintiff must aver this personal involvement through allegations of participation, personal

direction or actual knowledge and acquiescence, and these allegations "must be made with

15

appropriate particularity."  Rode, 845 F.2d at 1207; *see also* Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000)) ("Particularly after Iqbal, the connection between the supervisor's directions and the constitutional deprivation must be sufficient to 'demonstrate a plausible nexus' or 'affirmative link' between the [directions] and the specific deprivation of constitutional rights at issue.'").

In the context of a defendant who is alleged to have performed in a supervisory role, courts have identified two general instances in which either the conduct of that supervisor-defendant or the policies and procedures of that supervisor-defendant may amount to personal involvement and thereby warrant a finding of individual, supervisory liability for a constitutional tort.  First, supervisory liability may attach if the supervisor personally "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in a subordinate's unconstitutional conduct.  A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (citing Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995)).  Second, liability may attach if the supervisor, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  Id. (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)).  In this second instance, "to hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the

supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice."  Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).

Here, Plaintiff does not allege, and the record does not support, that Defendant Gilmore had any involvement in, or prior or contemporaneous knowledge of, Plaintiff's medical care or the various events or circumstances alleged in Plaintiff's Complaint with regard to his medical care and treatment.  Plaintiff also does not allege any relevant policy, practice, or custom of which Defendant Gilmore was aware that created an unreasonable risk to Plaintiff's medical needs and to which he was deliberately indifferent that ultimately resulted in the harm Plaintiff is alleged to have suffered.  Instead, Plaintiff appears to base his claims against Defendant Gilmore solely on his position as Superintendent of SCI-Greene.  This is not sufficient to establish personal involvement, and for this reason he is entitled to summary judgment on Plaintiff's claims.

4. **Defendant Guth is entitled to summary judgment because the record demonstrates that he was not personally involved in any of the conduct underlying Plaintiff's claims.**

Defendants move for summary judgment on the ground that the record demonstrates that Defendant Guth was not personally involved in any of the conduct underlying Plaintiff's claims. Specifically, Plaintiff's claims against Defendant Guth appear to be rooted in Guth's alleged role as the Corrections Health Care Administrator at SCI-Greene relative to Plaintiff's concerns and complaints with his medical care and treatment at SCI-Greene in the first several months of 2017.  However, the record demonstrates that while CHCA Guth once held the position of Corrections Health Care Administrator in an acting capacity at SCI-Greene, he did not do so during the relevant time identified in Plaintiff's Complaint, which appears to be from January

17

2017 to May 2017.  Rather, by December of 2016, Guth had returned to his former position as Medical Records Supervisor, which did not involve the provision of medical care and treatment to inmates.  Thus, at the time Plaintiff is claiming he was denied adequate medical care and treatment, Defendant Guth was no longer the CHCA and, more importantly, had no involvement in or responsibility for any inmate's medical care and treatment.  For this reason, Defendant Guth is entitled to summary judgment.

**5. <u>Defendants are also entitled to summary judgment because they are non-medical prison administrators and the record demonstrates that Plaintiff was under the care of medical professionals during the time period at issue.</u>**

In the alternative to the above grounds, Defendants also move for summary judgment on the ground that they are non-medical prison administrators and the record reveals that Plaintiff was under the care of medical professionals during the time period at issue.

In order to succeed on a claim that a defendant violated the Eighth Amendment in the context of medical care, a plaintiff must show that the defendant engaged in "acts or omissions sufficiently harmful to evidence deliberate indifferent to serious medical needs."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976).  The first showing requires the court to objectively determine whether the medical need was "sufficiently serious".  A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  <u>Monmouth County Correctional Institutional Inmates v. Lanzara</u>, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted).

The second prong requires a court subjectively to determine whether the officials acted with a sufficiently culpable state of mind.  Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial

of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury.  Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993) (citing Lanzaro, 834 F.2d at 346)).  A prisoner must demonstrate that the official acted with more than mere negligence.  Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health or safety.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Additionally, it is a "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims."  White v. Napoleon, 897 F.2d 103, 110 (3d. Cir. 1990).  Moreover, "[a] court may not substitute its own judgment for diagnosis and treatment decisions made by prison medical staff members."  Maynard v. New Jersey, 719 F.Supp. 292, 295 (D.N.J. 1989) (citing Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)).

It is important to note that "[i]f a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (citing Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)).  "This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on."  Id.  Thus, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  Id.

Here, the record demonstrates that Plaintiff was under the care of medical professionals during the relevant time period while at SCI-Greene and that he was receiving appropriate

treatment for his medical conditions that actually required treatment.  There are no allegations that either Defendant Guth or Gilmore interfered with Plaintiff's ability to see the medical staff or otherwise prevented him from doing so.  Moreover, even though the allegations in Plaintiff's Complaint concern his medical care after Defendant Guth had already returned to his position as Medical Records Supervisor, Guth stated in his declaration that at no time during his tenure as acting CHCA, or as Medical Records Supervisor, did he come to believe that any inmate, including Plaintiff, was being denied any necessary or required medical care and treatment.  Defendant Gilmore likewise stated the same in his declaration.  Nevertheless, despite these statements from Defendants, Plaintiff's medical records in and of themselves belie any claim that he could possibly make against either Defendant, as they reveal that, at least during the time period from January 2017 to January 2019, he received substantial medical care and appropriate treatment for his medical needs although he may have at times, or almost always, disagreed with his diagnoses and the care and treatment he received.  As such, Defendants cannot be deliberately indifferent for failing to intervene in Plaintiff's ongoing medical care, and they are entitled to summary judgment on this ground as well.

### 6.  __Plaintiff cannot establish an independent Fourteenth Amendment claim.__

Defendants argue that Plaintiff cannot establish an independent Fourteenth Amendment claim to the extent he is attempting to do so.  They note that other than identifying the Fourteenth Amendment and including the term "due process," it does not appear that Plaintiff makes any specific allegations in support of an independent Fourteenth Amendment claim, and to the extent that he does then such claim would be barred by the "explicit textual source" rule.  The Court agrees.  A careful reading of the Complaint does not reveal that Plaintiff is attempting to invoke the protections of the Fourteenth Amendment's Due Process Clause.  But, insofar as Plaintiff is

asserting an independent Fourteenth Amendment due process claim, such a claim would be foreclosed by the "explicit textual source" rule as stated in <u>Albright v. Oliver</u>, 510 U.S. 266 (1994). Specifically, in <u>Albright</u>, the Supreme Court stated that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." <u>Id</u>. at 273 (internal quotations omitted). Here, it appears that Plaintiff's Fourteenth Amendment claim is duplicative of his Eighth Amendment claim against the Defendants as both concern Plaintiff's allegation that the Defendants were deliberately indifferent to his serious medical needs. His claims are clearly governed by the Eighth Amendment, and, as such, his Fourteenth Amendment claim is foreclosed by <u>Albright</u>.

For all the aforementioned reasons, Defendants' Motion for Summary Judgment will be granted. A separate Order follows.

Dated:  September 21, 2021.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Jerome Junior Washington
       HV0282
       SCI Rockview
       Box A
       1 Rockview Place
       Bellefonte, PA  16823

       Counsel of record
       (Via CM/ECF electronic mail)

21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JEROME JUNIOR WASHINGTON, | ) | |
| | ) | Civil Action No. 18 – 339 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| SUPERINTENDENT MR. GILMORE | ) | |
| and MEDICAL CHCA-MR. GUTH, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

**AND NOW**, this 21st day of September, 2021, and for the reasons stated in the Court's Memorandum Opinion issued contemporaneously herewith,

**IT IS HEREBY ORDERED** that the Defendants' Motion for Summary Judgment (ECF No. 90) is **GRANTED**.

**IT IS FURTHER ORDERED** that judgment shall be entered in favor of Defendants and against Plaintiff.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure, Plaintiff  has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
United States Magistrate Judge

22

Cc:     Jerome Junior Washington
        HV0282
        SCI Rockview
        Box A
        1 Rockview Place
        Bellefonte, PA  16823

        Counsel of record
        (Via CM/ECF electronic mail)